# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs January 24, 2012

## ANTHONY M. PATTON v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Hamblen County**
**No. 10CR679     John F. Dugger, Jr., Judge**

_____

**No. E2011-01651-CCA-R3-PC - Filed March 14, 2012**

_____

The Petitioner, Anthony M. Patton, pled guilty to one count of especially aggravated kidnapping and one count of facilitation of first degree murder. The trial court sentenced him to an agreed upon effective sentence of fifty years. The Petitioner filed a petition for post-conviction relief, and the post-conviction court dismissed the petition after holding a hearing. On appeal, the Petitioner contends that: (1) he received the ineffective assistance of counsel; and (2) his guilty pleas were not knowingly and voluntarily entered. After a thorough review of the record and applicable authorities, we affirm the post-conviction court's dismissal of his petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and JEFFREY S. BIVINS, JJ., joined.

Francis X. Santore, Jr., Greeneville, Tennessee, for the appellant, Anthony M. Patton.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; C. Berkeley Bell, Jr., District Attorney General; Victor J. Vaughn, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Facts
### A. Guilty Plea Hearing

The Petitioner pled guilty to one count of especially aggravated kidnapping and one count of facilitation of first degree murder. At the plea submission hearing, the

Petitioner testified that he had a ninth grade education and could read and write without difficulty. He said he had no health, physical, or mental conditions that affected his ability to understand the hearing and that he had not consumed any alcohol or drugs.

The trial court explained to the Petitioner that he had been indicted on two counts. The first count alleged that he had committed the offense of especially aggravated kidnapping by confining Willie L. Morgan for ransom. The trial court explained that any sentence for a conviction for this offense was required to be served at 100%. The trial court further explained that he was also charged with first degree murder for killing Willie L. Morgan in the perpetration of the kidnapping. The trial court then explained the lesser-included offense of facilitation to commit first degree murder. The trial court went through the elements of each offense and asked the Petitioner if his counsel had also discussed those elements with him. The Petitioner answered affirmatively. The trial court then asked the Petitioner if he understood the guilty plea petition and if he had any questions about the petition.

The trial court accepted the Petitioner's guilty plea to especially aggravated kidnapping and facilitation of first degree murder. The trial court sentenced the Petitioner, pursuant to the plea agreement, to twenty-five years for the especially aggravated kidnapping conviction, to be served at 100%, and twenty-five years for the facilitation conviction, to be served at 30%. In accordance with the plea agreement, the sentences were to be served consecutively.

## C. Post-Conviction Hearing

The Petitioner filed a petition for post-conviction relief, alleging that he had received the ineffective assistance of counsel and that his guilty pleas were not knowingly and voluntarily entered. Specifically, the Petitioner alleged: (1) that he did not understand he would receive consecutive sentencing and that Counsel told him he would receive a twenty-five year sentence; (2) that he had requested, but not received, new counsel; (3) that Counsel was ineffective for failing to order a psychological examination; and (4) that he did not understand the nature and consequences of his guilty plea because he reads and writes on a third-grade level.

At a hearing on his petition, the Petitioner testified about several instances in which he felt Counsel was ineffective. He first noted that he had asked Counsel for his discovery motion but never received a copy of the motion. Further, he said that he asked Counsel to have him psychologically evaluated but that Counsel never pursued it. The Petitioner said Counsel told him that Counsel's planned defense strategy, if the case went to trial, was "nothing." The Petitioner explained that Counsel told him, if the case went

2

to trial, the State was going to seek the death penalty. Counsel told him that his options were to take the plea deal or to go to trial and lose.

The Petitioner said that, at one point, he "fired" Counsel. He said, however, the trial court informed him that Counsel could not be fired because they were so far along in the case. The Petitioner testified that Counsel told him what to say during the guilty plea hearing. He said his responses to the trial court's questions were not his desired responses but, rather, the responses that Counsel told him to give. The Petitioner said that he wanted to take his case to trial.

The Petitioner recalled that, at one point before his trial, he met with several detectives and Counsel. The detectives told him that the State would offer him a fifteen-year sentence, to be served at 100%, if he could give them the murder weapon. The Petitioner said he told police officers where they could find the gun, but they never recovered the gun. The Petitioner said that the officers returned to him and told him that the gun was not in the location he described. He said he found out where the gun "really" was located, but the State told him that the offer was now twenty-five years at 100%. The Petitioner, therefore, never told them the true location of the weapon.

The Petitioner said he had difficulty reading and writing. He said he took "resource" classes while in junior high and high school. He said that, when he pled guilty, he did not understand that his sentences would run consecutively rather than "together."

The Petitioner recounted how a rift developed between him and Counsel. He said this rift developed when Counsel refused to give him the discovery he requested. The Petitioner said he needed the discovery, in part, because it included a coerced confession. He said that, at the beginning of the police interview that led to his confession, he asked for an attorney. Law enforcement officers, he said, told him "no." He said that during the interview he repeatedly asked for an attorney and police denied his request each time. He further asserted that "the majority of the stuff in [the statements] I did not tell [the law enforcement officers]."

On cross-examination, the Petitioner testified that he had made it clear to the trial court that he wanted Counsel removed from representing him. He agreed that, at a later hearing, he also told the trial court that he believed that Counsel could represent him even if the two did not agree on whether he should plead guilty.

The Petitioner agreed he gave a "rather lengthy" statement to police officers. After he gave his first statement, he sent a letter to the detective assigned to the case, requesting

3

an interview. The Petitioner agreed that he wrote the letter himself. After he wrote the letter, he had a meeting with the detective and told him where he thought the gun might be. The Petitioner gave the detective this information in exchange for an agreement that he would serve fifteen years at 100%. The Petitioner said that, while Counsel arranged this meeting, he was not present during the meeting. During the meeting, the Petitioner told police officers where he believed the gun used in the murder was located. Officers never found the gun, so the agreement to fifteen years at 100% did not apply.

The Petitioner recalled that he and the State also discussed an agreement wherein he would testify against two of his co-defendants in exchange for twenty-five years at 100%. The Petitioner did not recall whether he entered into this agreement with the State and backed out of the agreement or whether he never entered into the agreement at all.

The Petitioner testified that he remembered the day of his guilty plea hearing. The State reminded the Petitioner that the trial court informed the Petitioner during the hearing that he faced up to fifty years in prison and that twenty-five of those years could be ordered to be served at 100%. The State recounted how the trial court told the Petitioner that he could be required to serve every single day of the fifty years, and the Petitioner told the trial court that he understood. The State reminded the Petitioner that the trial court asked the Petitioner if he understood the entire agreement, and the Petitioner said yes. The trial court then said to the Petitioner "now, you're not going to come back later and say [Counsel] didn't tell you or I didn't tell you," and the Petitioner responded that he would not. During the plea submission hearing, the Petitioner expressed satisfaction with Counsel's representation and said that Counsel had done everything the Petitioner had asked.

Felicia Patton, the Petitioner's mother, testified that, while she was not present, she knew the Petitioner asked for an attorney when he was initially questioned. She said she also asked for the Petitioner to be given an attorney, but police officers told her that she was not capable of invoking that right for the Petitioner. Patton testified that the Petitioner completed the tenth grade in school and that, while in school, he had been assigned to "resource" classes. She said that he had suffered from multiple high fevers when he was a young child, which she termed a "setback." She said he also suffered from arthritis, Bells Palsy, and a mild stroke that damaged part of his brain. Patton testified that the Petitioner had a "learning defect" and could not catch up with the other children in reading and writing. She said that, while he went to high school, he could not read or write on a high school level.

Counsel testified that his primary practice focused on criminal defense work. He said that when he first became involved with the Petitioner's case he requested a

4

transcript from the preliminary hearing, which he then reviewed.  Counsel said that the State had a "strong" case against the Petitioner.  He asked the trial court to approve an independent forensic medical examiner, and the trial court approved this request.  The independent expert agreed with the State medical examiner about the victim's cause of death.

Counsel testified that he and his investigator each spent over 100 hours investigating the Petitioner's case.  He said he filed in excess of thirty motions and "combed" through the discovery provided to him by the State.  Counsel said he met with the Petitioner more than twenty times and, some weeks, he met with him every day.

Counsel said he  provided the Petitioner with the discovery packet given to them by the State.  He offered correspondence between him and the Petitioner in which he told the Petitioner that the discovery packet contained multiple pictures of the victim.  He told the Petitioner that, in his experience, with pictures of this nature that involved an elderly victim it was not a good idea to have those pictures left at the jail.  Counsel was concerned that other inmates may "not take well to the portraits."  He further explained that this was made more important by the fact that this case involved co-defendants.  He, therefore, suggested that he give the Petitioner the discovery in "increments" for the Petitioners' review.  He encouraged the Petitioner to make notes on the discovery, so the two could then sit down together and talk about it.  Counsel said the Petitioner "got every bit of discovery in his case."

Counsel testified that he never felt as if he and the Petitioner had difficulty communicating.  He recalled that, during their initial meeting, the Petitioner told him that he was going into the eleventh grade and that he wrote at a ninth grade level.  Counsel recalled that the Petitioner gave law enforcement a "lengthy" and "detailed" confession," which presented a problem from a defense stand point.

Counsel testified that there were "no signs" that the Petitioner needed a mental evaluation.  The two never discussed this as a defense to his case, and the Petitioner never broached the subject of a mental evaluation with Counsel.

Counsel recounted that there were several proposed agreements between him and the State about the disposition of the Petitioner's case.  He said he explained to the Petitioner the agreement to which the Petitioner ultimately pled guilty.  He said the two discussed the consequences of the Petitioner's guilty pleas.  Counsel said that there was never any discussion that the sentences would run concurrently.  He recalled:

[I]f it had been a concurrent sentence, then I wouldn't have fought so hard

5

to get his original agreement back because the agreement was twenty-five years at one hundred percent. If it was concurrent, that would have been the original agreement.

Counsel said that he provided the Petitioner with the date of the Petitioner's earliest parole eligibility. Counsel said he felt as if he did everything in this case that he could have possibly done.

On cross-examination, Counsel agreed that he had been practicing law for six years and that he had assisted on three homicide cases. He said he met with the Petitioner within a week of being appointed to his case. He said that during their initial interview they did not discuss the facts of the case but did discuss that there were some co-defendants involved. Counsel said he was aware that the Petitioner did not have a lawyer present during his confession. Counsel said that, even though the Petitioner never told him that he had asked for a lawyer, he filed a motion to suppress the statement. The trial court never held a hearing on the motion because he and the State reached an agreement on the motion.

Counsel said that the State's case for especially aggravated kidnapping was strong. There was some issue, however, with the time frame between when the kidnapping occurred and when the murder occurred, to support the charge of felony murder. The State medical examiner had offered only an "estimated time of death."

Counsel testified that he and the Petitioner first had a problem in July 2009, when the Petitioner contacted his office to say that he was firing the Petitioner. The Petitioner left him a message that concluded with, "I'm firing you, asshole." Counsel said he immediately went to the jail and spoke with the Petitioner. He memorialized the conversation that the two had in a letter that he sent to the Petitioner. Counsel read that letter into evidence and, in it, Counsel reminded the Petitioner of the charges that he faced and the sentencing ranges that accompanied those charges. Counsel reminded the Petitioner that he had reached an agreement with the State wherein the first degree murder charge was going to be dismissed in exchange for the Petitioner's plea of guilty to especially aggravated kidnapping. He was going to be sentenced as a Range I offender to twenty-five years but would be required to serve 100% of that sentence, less up to 15% credit. Counsel stated in the letter that it was his understanding that the Petitioner no longer wanted to accept that offer and wanted to go to trial. Counsel said, "I indicated to you that there comes a point in time that you have to make your decision as to whether you'll accept . . . any offer from the state of Tennessee in lieu of going to trial." Counsel next said in the letter that the two had discussed the Petitioner's desire for Counsel to be relieved from representing the Petitioner. He said that he understood that the Petitioner

6

now wanted him to remain his counsel and to prepare his case for trial. Counsel went on in the letter to say that he would forward to the Petitioner all of the discovery materials. He warned the Petitioner to keep this evidence in his possession and that if the evidence got into the wrong hands it "could mean the difference between life and death in the Tennessee Department of Correction[]." At the conclusion of the letter, Counsel asked the Petitioner to call him if the Petitioner's recollection of their conversation was different from Counsel's summary in the letter.

Counsel recalled that he and the Petitioner reached an agreement with the State, wherein the State would agree to a fifteen-year sentence if the Petitioner could give the State the murder weapon. Counsel recalled that they went with police officers to the Petitioner's grandmother's house, where the Petitioner implored her to provide him the gun. The gun, however, was never found. Because the agreement with the State was contingent on finding the weapon, the State withdrew the agreement when the weapon was not found.

Counsel testified that, on March 3, 2010, he received correspondence from the Petitioner saying that he did not want to go to trial, he wanted another lawyer, and he did not want to speak with Counsel. Counsel said he immediately met with the Petitioner that same day to discuss his hesitation about having Counsel represent him. Counsel then orally requested the trial court allow him to withdraw from the case. The trial judge questioned the Petitioner, who then indicated to the judge that he was "okay" with Counsel representing him.

Counsel testified that the Petitioner told him that he read and wrote on a ninth grade level, and Counsel had no indication that the Petitioner read at a third grade level. Further, based on the letters that the Petitioner wrote to Counsel, Counsel had no indication that the Petitioner had difficulty reading or writing.

Based upon this evidence, the post-conviction court dismissed the Petitioner's petition for post-conviction relief. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner maintains two issues, that: (1) he received the ineffective assistance of counsel because Counsel did not ask whether he understood the waiver of rights and plea of guilty; and (2) his guilty pleas were not knowingly and voluntarily entered because he has the reading comprehension of an elementary school student.

To obtain post-conviction relief, a petitioner must show that his or her conviction

or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The Petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's factual findings are subject to *de novo* review by this Court; however, we must accord these factual findings a presumption of correctness, which can only be overcome when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely *de novo* review by this court, with no presumption of correctness. *Id.* at 457.

### 1. Ineffective Assistance of Counsel

The Petitioner asserts that Counsel was ineffective for failing to inquire whether he understood his waiver of rights and plea of guilty. He notes that he had not completed the ninth grade, was in resource classes in high school, and had been coached by Counsel to give the responses.

Both the Sixth Amendment to the United States Constitution and Article I, section 9, of the Tennessee Constitution guarantee the right of a criminally accused to representation. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that trial counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

8

In reviewing a claim of ineffective assistance of counsel, this court must determine whether the advice given or the services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). We should not deem that counsel was ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. *House*, 44 S.W.3d at 515 (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. *House*, 44 S.W.3d at 515.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994). In the context of a guilty plea as in this case, the effective assistance of counsel is relevant only to the extent that it affects the voluntariness of the plea. Therefore, to satisfy the second prong of *Strickland*, the petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v.*

*Lockhart*, 474 U.S. 52, 59 (1985); *see also Walton v. State*, 966 S.W.2d 54, 55 (Tenn. Crim. App. 1997).

The post-conviction court found that "Petitioner is not credible and cannot be believed even under oath." It further stated, "All of the evidence shows that Petitioner can read and write and that the nature of the charges were explained to Petitioner by his attorney, and by the Court." After reciting very thorough findings of fact, the post-conviction court further found that the Petitioner had not proven by clear and convincing evidence that Counsel's representation fell below a reasonable standard or that he was prejudiced. We agree with the post-conviction court.

Counsel initially met with the Petitioner and explained the charges he faced. Counsel did an exemplary job of documenting his file with detailed letters summarizing the conversations between him and the Petitioner. Counsel explained to the Petitioner, both orally and in writing, the State's plea offers, the requirements of those offers, and the consequences of those offers. During the guilty plea hearing, both the trial court and Counsel ensured that the Petitioner understood the nature and consequences of his two guilty pleas. They both informed him about the rights he was waiving and the consequences of waiving those rights. We find the Petitioner's bare assertion that Counsel did not inquire about whether he understood his waiver of rights and plea of guilty and that Counsel "coached" him on how to respond during the guilty plea hearing unconvincing. The Petitioner has not proven that Counsel's representation fell below a reasonable standard, and he is not entitled to post-conviction relief.

### B. Knowingly and Voluntarily Entered Plea

The Petitioner asserts his guilty plea was not knowing and voluntary because Counsel did not ensure that he understood his waiver of rights form. When evaluating the knowing and voluntary nature of a guilty plea, the United States Supreme Court has held that "[t]he standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970). The court reviewing the voluntariness of a guilty plea must look to the totality of the circumstances. *See State v. Turner*, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995); *see also Chamberlain v. State*, 815 S.W.2d 534, 542 (Tenn. Crim. App. 1990). The circumstances relevant to a guilty plea include:

> the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the

charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

*Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993) (citing *Caudill v. Jago*, 747 F.2d 1046, 1052 (6th Cir. 1984)). A plea resulting from ignorance, misunderstanding, coercion, inducement, or threats is not "voluntary." *Id.*

"Whether a guilty plea meets the constitutional standards of voluntary and knowing is a mixed question of law and fact." *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003) (citing *United States v. Gray*, 152 F.3d 816, 819 (8th Cir. 1998)). This Court reviews mixed questions of law and fact *de novo* with a presumption of correctness "given only to the post[-]conviction court's findings of fact." *Id.* (citing *Fields*, 40 S.W.3d at 458).

The post-conviction court found:

The Court finds that Petitioner is not credible and cannot be believed even under oath. All of the evidence shows that Petitioner can read and write and that the nature of the charges were explained to Petitioner by his attorney . . . and by the Court. Petitioner stated that he understood the charges and elements of each charge. The Petitioner clearly understood the consequences of his plea as the court explained the sentences and release eligibility percentage for each sentence. [Counsel] testified [that] he [had] explained Petitioner's sentences to him and presented the sheet reflecting the calculations for each sentence. The Court explained that the sentences were to be served consecutively for an effective sentence of fifty years and Petitioner said that he understood.

We agree with the post-conviction court that the evidence supports that the Petitioner's plea was knowingly and voluntarily entered. The Petitioner stated during that the post-conviction hearing that he read at a elementary school level, but the evidence in the record proves that he writes at a high school level and that, at the very least, he completed the ninth grade. Counsel's representation of the Petitioner was competent and the two discussed the Petitioner's options, which varied throughout the course of Counsel's representation, on many occasions. Counsel offered advice to the Petitioner both orally and in writing. The Petitioner faced charges of first degree felony murder, for which the State sought a punishment of life in prison. The record proves that both the trial court and Counsel independently explained thoroughly to the Petitioner the nature of the charges he faced, the plea agreement, and the sentence he would serve. We conclude

11

that the Petitioner entered his guilty pleas knowingly and voluntarily and that he is not entitled to post-conviction relief.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the post-conviction court's dismissal of the Petitioner's petition for post-conviction relief.

_____

ROBERT W. WEDEMEYER, JUDGE

12